UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| BRYAN AUSTIN BONESHIRT | * | CIV 13-3008-RAL |
| | * | (10-CR-30008-RAL) |
| Petitioner, | * | |
| | * | |
| -vs- | * | OPINION AND ORDER |
| | * | GRANTING THE |
| UNITED STATES OF AMERICA, | * | GOVERNMENT'S |
| | * | MOTION TO DISMISS |
| Respondent. | * | |

Bryan Austin Boneshirt (Boneshirt), an inmate serving a 576-month sentence in the custody of the Federal Bureau of Prisons for second-degree murder, filed a pro se Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. Doc. 1. Several months later, attorney Ronald A. Parsons, Jr., filed on behalf of Boneshirt an Amended Motion to Vacate, Set Aside, or Correct Pursuant to 28 U.S.C. § 2255. Doc. 5. The Government responded to Boneshirt's motion and filed a Motion to Dismiss for Failure to State a Claim. Docs. 14, 15. For the reasons set forth below, the Government's Motion to Dismiss is granted.

Boneshirt's asserted grounds for § 2255 relief are based primarily on legal, rather than factual, arguments and issues. Boneshirt did not request an evidentiary hearing and abandoned his one initial claim—ineffective assistance of counsel—that would require additional information in the record. Thus, this case can be decided on the record in Boneshirt's underlying case and the motion and filings in this proceeding. "No hearing is required . . . 'where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.'" Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008) (quoting Watson v.

1

United States, 493 F.3d 960, 963 (8th Cir. 2007)).   Therefore, an evidentiary hearing is not needed.

## I.   BACKGROUND[1]

Boneshirt was born on May 3, 1992.  On November 1, 2009, Boneshirt, at that time a seventeen-year-old member of the Rosebud Sioux Tribe, and Marquita Walking Eagle, a nineteen-year-old member of the Rosebud Sioux Tribe, were at a party in St. Francis, South Dakota, on the Rosebud Indian Reservation, where both consumed alcohol.  10-CR-30008-RAL, Doc. 75 at 1–2.  Boneshirt and Walking Eagle walked together to a store in St. Francis on November 1, 2009.  Id.  Later that day, Walking Eagle's lifeless body was found in an abandoned and dilapidated home in St. Francis.  10-CR-30008-RAL, PSR at ¶¶ 17, 19.  Her hands were bound behind her back.  She was naked from the waist down with her pants around her ankles and clothes removed from her breast area.  10-CR-30008-RAL, Doc. 75 at 2.  There was evidence that she either had been raped or had engaged in sexual intercourse.  Her face was battered and badly swollen, particularly on the left side.  Id. at 2.  Walking Eagle had been strangled to death.  Id. at 2–3.

While Tribal Police were learning of the murder, Boneshirt packed a bag and attempted to flee by walking from St. Francis toward his mother's house in Rosebud.  10-CR-30008-RAL, PSR at ¶ 19.  Boneshirt had a cell phone with him at the time, which he used to call family members.  Id.  During those conversations, Boneshirt made incriminating statements about having murdered Walking Eagle.  Id.  When arrested, however, Boneshirt initially denied having done anything to Walking Eagle.  10-CR-30008-RAL, Doc. 91 at 18; Doc. 107 at 148–49.

---

[1]This Opinion and Order draws facts from portions of the Presentence Investigation Report (PSR) to which neither party objected and from materials of record in United States v. Boneshirt, 10-CR-30008-RAL.  Filings from the underlying criminal action will be cited in this opinion with the criminal case number followed by the docket number, e.g. 10-CR-30008-RAL, Doc. __.

After Boneshirt's apprehension, the Government on January 29, 2010, charged Boneshirt in a Juvenile Information with one count of First Degree Murder and one count of Aggravated Sexual Abuse of Walking Eagle. 10-CR-30008-RAL, Doc. 1. On February 9, 2010, the Government filed a Motion to Transfer, Doc. 22, seeking to treat Boneshirt as an adult on the first-degree murder and aggravated sexual assault charges. Boneshirt was represented by counsel from the Federal Public Defender's Office. Eventually Boneshirt, with counsel, negotiated a plea agreement in which he agreed to be proceeded against as an adult and to plead guilty to a Superseding Information charging him with second-degree murder. 10-CR-30008-RAL, Doc. 74 at 2.

As part of entering into a plea agreement, Boneshirt signed a Factual Basis Statement, which provided his story as to what occurred. The Factual Basis Statement, which Boneshirt affirmed under oath during his change of plea hearing to be accurate, stated:

> On or about the 1st day of November, 2009, at St. Francis, Todd County, in Indian country, in the District of South Dakota, Bryan Austin Boneshirt, an Indian, did unlawfully and with malice aforethought, murder a human being, Marquita Walking Eagle, by choking Marquita Walking Eagle, in violation of 18 U.S.C. §§ 1153 and 1111.
> On November 1, 2009, Bryan Boneshirt was drinking alcohol with Marquita Walking Eagle, date of birth, March 15, 1990, and some other friends in St. Francis, South Dakota. Mid-afternoon, Boneshirt and Walking Eagle left the residence where they were drinking and walked together towards a local convenience store and attempted to buy cigarettes. Unsuccessful in an effort to obtain cigarettes, Boneshirt and Walking Eagle entered an abandoned house near the convenience store.
> Around an hour later, Boneshirt arrived at his brother Koty Arcoren's house. Boneshirt told Koty that he had murdered Walking Eagle. Koty and other family members and friends went to go check on the abandoned house and Walking Eagle's condition and the police were notified. The police went to the abandoned house and found Walking Eagle, who was naked from the waist down and her bra and sweater had been moved, exposing her breasts. Her pants were down around her ankles. The left side of her face was swollen and had been beaten.
> An autopsy was performed on Walking Eagle's body on November 3, 2009, by Doctor Donald Habbe at the Rapid City Regional Hospital. During the

3

autopsy, Dr. Habbe noted petechia (broken blood vessels which formed red blots on the iris) in both eyes and a subdural hemorrhage (bleeding below the skull) on the brain. Dr. Habbe advised that the injuries would be consistent with asphyxiation secondary to manual strangulation and blunt force trauma. Dr. Habbe found that Walking Eagle suffered a contusion around her left eye, a contusion on her chin area, a bloody nose, and other injuries.

During an interview with law enforcement, Boneshirt said he had consensual sexual intercourse with Walking Eagle. He said he and Walking Eagle got angry with each other and he used his fists to strike Walking Eagle about the head and body, causing her to receive injuries. He choked her to death. Boneshirt intended to act with malice aforethought and did willfully act in callous and wanton disregard of the consequences to human life when he beat Walking Eagle about the face, and choked her to death.

Bryan Austin Boneshirt is an "Indian" under the provisions of 18 U.S.C. § 1153 in that he is an enrolled member of the Rosebud Sioux Tribe, enrollment number 345U032997 and 51 / 64 degree Indian by blood and the offenses occurred in St. Francis, in Todd County, South Dakota, in Indian country, which is within the exterior boundaries of the Rosebud Indian Reservation. This location is "Indian Country" within the provisions of 18 U.S.C. §§ 1151, 1153, and 5032.

10-CR-30008-RAL, Doc. 75. Boneshirt pleaded guilty to the Second Degree Murder charge on June 9, 2010. 10-CR-30008-RAL, Doc. 83.

In June of 2010, Boneshirt was in custody at the then-new Hughes County Jail. The Hughes County Jail housed Boneshirt in the men's work-release area along with several other males who faced charges as juveniles but who, like Boneshirt, had turned eighteen while in custody. 10-CR-30008-RAL, Doc. 107 at 25–26. The work-release area was like a dormitory room with bunk beds and living space, to which was attached a bathroom and shower area. 10-CR-30008-RAL, Doc. 107 at 30–31, 34, Ex. 10. On the evening of June 9, 2010, after Boneshirt returned to the Hughes County Jail from pleading guilty as an adult to second-degree murder, guards noticed unusual activity in the area where Boneshirt was housed, including inmates spending excessive time in the bathroom area and one inmate walking a circle and pausing to look out the window as if checking on whether a guard was coming. 10-CR-30008-RAL, Doc. 107 at 18–19, 21–22. The next day, on June 10, 2010, Hughes County Jail officials searched the

4

work-release area and found a shank, cement block beneath a bunk, and other items fashioned into weapons. 10-CR-30008-RAL, Doc. 107 at 63–76, 105, 145–48. Separate interviews of those in the work release area—and testimony at Boneshirt's sentencing hearing—established that Boneshirt was at the center of a plan to break out of the Hughes County Jail. 10-CR-30008-RAL, Doc. 107 at 91–110.

Boneshirt had discovered that he could climb up above a toilet where he was out of view of security cameras, move aside a ceiling tile, and get into an area above the ceiling. 10-CR-30008-RAL, Doc. 107 at 50–55, 94–99. Boneshirt had pried loose and removed a cinder block in the crawl space above the ceiling. 10-CR-30008-RAL, Doc. 107 at 104. Boneshirt had used a blanket wrapped around himself to carry the cinder block undetected to place it beneath a bunk bed out of view of security cameras. 10-CR-30008-RAL, Doc. 107 at 107. Boneshirt and others then used the cinder block to sharpen objects into shanks. 10-CR-30008-RAL, Doc. 107 at 94, 99–105, 128. Boneshirt had explored how far he could move about in the crawl space above the ceiling and could get to a point beyond a security door. 10-CR-30008-RAL, Doc. 107 at 94–96. Boneshirt's plan was to drop down through the ceiling at that point where there might be just one guard between him and escape from the jail. 10-CR-30008-RAL, Doc. 107 at 94, 109–10. Three other young men, none of whom faced charges as serious as did Boneshirt, agreed to join in Boneshirt's escape plan. 10-CR-30008-RAL, Doc. 107 at 108–10, 121–22, 125. None of those other three offenders faced prison sentences anywhere close to as long as Boneshirt's sentence. Boneshirt volunteered to take the lead, explaining that he had killed before and could kill again. 10 CR-30008-RAL, Doc. 107 at 108.

On September 13, 2010, this Court conducted Boneshirt's sentencing hearing. 10-CR-30008-RAL, Doc. 96. Between 1:05 p.m. and 6:55 p.m, this Court heard testimony and received

exhibits from many witnesses, heard argument concerning and ruled on objections to the presentence investigation report, considered victim impact statements, listened to statements on behalf of Boneshirt, considered argument of counsel and Boneshirt's allocution, and provided explanation and analysis of the factors under 18 U.S.C. § 3553(a). This Court considered Boneshirt's crime and subsequent conduct. This Court considered Boneshirt's personal history, which revealed a troubled and difficult upbringing. Boneshirt, among other things, had faced charges in Rosebud Sioux Tribal juvenile court on fifteen prior occasions, some quite serious and some not so serious, with some resulting in prison time and some being dismissed. Recognizing Boneshirt's young age when discussing the tribal court juvenile history, this Court noted:

> The Court is careful when considering juvenile history and considering history from tribal court proceedings because of due process issues, and the juvenile history because [Boneshirt] is a child, a person who is considered to be a child under the law until age eighteen, a juvenile.

10-CR-30008-RAL, Doc. 107 at 203. This Court then highlighted an instance on October 24, 2006, the most serious of Boneshirt's prior tribal juvenile history, where Boneshirt entered an apartment through a back door at night, took a knife from the apartment's kitchen, went to a bedroom where a seven-year-old girl and a fifteen-year-old girl were sleeping, held the knife to the throat of the fifteen-year-old girl, and threatened to cut her throat if she said anything. After the girl screamed, others in the home responded, overpowered Boneshirt, and held him until tribal police arrived.

This Court considered, among many other factors, Boneshirt's youth and explained in its reasoning: "Mr. Boneshirt, it is unfair how you were raised. You were very troubled from a very early age. You are very young, 17 years old, now 18. It is a factor the Court considers." 10-CR-30008-RAL, Doc. 107 at 202. This Court ultimately sentenced Boneshirt to 576 months

of custody in the Federal Bureau of Prisons, followed by a five-year term of supervised release. 10-CR-30008-RAL, Doc. 98.

Boneshirt appealed, challenging the reasonableness of the term of imprisonment. United States v. Boneshirt, 662 F.3d 509, 511 (8th Cir. 2011) cert. denied 132 S. Ct. 1613 (2012).  The United States Court of Appeals for the Eighth Circuit affirmed the sentence.  Id.  Boneshirt petitioned the Supreme Court of the United States for a writ of certiorari, which was denied on February 21, 2012.  United States v. Boneshirt, 132 S. Ct. 1613 (2012).

Acting pro se, Boneshirt filed his original Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255.  Doc. 1.  Boneshirt's original motion expressly raised three grounds for relief:  (1) he was improperly interviewed by federal agents without a guardian present, (2) his speedy trial rights were violated, and (3) his sentence was unreasonable.  Doc. 5-1.  The original motion appeared to claim a fourth ground for relief—that Boneshirt's counsel during his trial and appeal was ineffective because he did not raise the first two issues on direct appeal.  Doc. 5-1 at 5–8.  Boneshirt's current counsel filed an Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, which reincorporated all of Boneshirt's original claims.  Doc. 5.  The amended § 2255 motion identified a fifth ground for relief—that Boneshirt's 576-month sentence violates the ban on mandatory life sentences for juvenile offenders articulated by the Supreme Court of the United States in Miller v. Alabama, 132 S. Ct. 2455 (2012) (barring mandatory sentences of life in prison without parole for juvenile homicide offenders).

In order for the Government to respond to Boneshirt's claim of ineffective assistance of counsel, this Court ordered that Boneshirt sign a waiver of his attorney-client privilege regarding his representation by the Federal Public Defender's Office during his original criminal

7

proceedings or the ineffective assistance of counsel claim would be stricken.  Doc. 17.  Boneshirt

decided not to waive his attorney-client privilege and thereby abandoned any claim of ineffective

assistance of counsel.  Doc. 18.  The remaining claims are before this Court on the Government's

motion to dismiss.

## II.   ANALYSIS

### A.   Improper Interview Claim

Inmates in federal custody may petition for relief from a sentence of a federal court that

has been "imposed in violation of the Constitution or laws of the United States," imposed by a

court "without jurisdiction to impose such sentence," is "in excess of the maximum authorized

by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.  "Relief under 28 U.S.C.

§ 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries

that could not have been raised on direct appeal and, if uncorrected, would result in a complete

miscarriage of justice."  United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996).  A

petitioner's failure to raise an issue available to him on direct appeal will bar raising that ground

as a basis for relief under § 2255 unless there is either "cause and actual prejudice . . . or [the

petitioner] is actually innocent."  Bousley v. United States, 523 U.S. 614, 622 (1998) (internal

quotations and citations removed).  In order to meet the cause requirement, the Supreme Court

requires a showing of "some objective factor external to the defense" that "impeded counsel's

efforts to comply with" the procedural rules.  Murray v. Carrier, 477 U.S. 478, 488 (1986)

(analyzing cause under § 2254).  A novel claim that raises a legal basis that was "not reasonably

available" to counsel on direct appeal or a claim that was futile at the time of direct appeal can

constitute cause for a procedural default.  Bousley, 523 U.S. at 622–23 (quoting Reed v. Ross,

468 U.S. 1, 16 (1984)).  To establish prejudice, a petitioner must show a "reasonable probability"

8

that the result of the trial would have been different absent the error. <u>Strickler v. Greene</u>, 527 U.S. 263, 289 (1999).

Boneshirt first claims, as a ground for relief under § 2255, that federal agents interviewed him while he was a juvenile without legal representation or supervision by a parent or guardian and pushed him to make statements regarding his conduct on November 1, 2009. Doc. 5-1 at 4. Boneshirt could have but did not raise this claim on direct appeal. Doc. 5-1 at 6; <u>see also</u> <u>Boneshirt</u>, 662 F.3d 509 (claiming error only on the reasonableness of the sentence imposed). Boneshirt abandoned any ineffective assistance of counsel, so Boneshirt has not alleged any objective external factor that prevented him from raising this issue on direct appeal. Therefore, this claim is procedurally defaulted and cannot provide a basis for relief under § 2255.

**B.**     **Speedy Trial Claim**

Boneshirt, as a second ground for relief, claims that his speedy trial rights were violated. Boneshirt could have but did not raise this claim during his direct appeal. Doc. 5-1 at 6; <u>see also</u> <u>Boneshirt</u>, 662 F.3d 509 (claiming error only on the reasonableness of the sentence imposed). Boneshirt does not make a claim of cause for the procedural default other than the abandoned allegation of ineffective assistance of counsel. Therefore, this claim also is procedurally defaulted.

**C.**     **Substantive Reasonableness of the Sentence Claim**

In Boneshirt's third ground for relief, he claims that the 576-month term of imprisonment ordered by this Court is an unreasonable sentence. Boneshirt raised this claim on his direct appeal. Doc. 5-1 at 8; <u>see also</u> <u>Boneshirt</u>, 662 F.3d 509 (claiming error on the reasonableness of the sentence imposed). The Eighth Circuit affirmed the sentence, addressing what appears to be

the same argument Boneshirt has made in his § 2255 motion.[2]  Boneshirt, 662 F.3d at 516–20.

Section 2255 is not intended to provide a forum to re-litigate issues decided on direct appeal, so

an issue litigated on direct appeal generally may not form the basis of a cognizable claim under

§ 2255.  United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001); United States v. Holtzen, 718

F.2d 876, 878 (8th Cir. 1983) (per curiam).  Therefore, Boneshirt's third claim in his original

§ 2255 motion is not cognizable by this Court and at any rate has been resolved by the Eighth

Circuit contrary to Boneshirt's position.

### D.    Eighth Amendment Claim

Boneshirt's amended § 2255 motion claims that the sentence of 576 months of custody

violates the prohibition of cruel and unusual punishment embodied in the Eighth Amendment of

the United States Constitution.  Doc. 5 at 2–4.  Boneshirt argues that Miller makes his

576-month sentence unconstitutional because it is a mandatory life without parole sentence that

constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Doc. 20 at 5–

22.

The Miller decision sits at the intersection of two lines of Eighth Amendment

jurisprudence.  See Miller, 132 S. Ct. at 2463, 2471.  The first line of precedent, stemming from

Graham v. Florida, 560 U.S. 48 (2010), and Roper v. Simmons, 543 U.S. 551 (2005), stands for

the proposition that "youth matters for purposes of meting out the law's most serious

punishments."  Miller, 132 S. Ct. at 2471.  Both Graham and Roper created categorical bans on

---

[2]Boneshirt states as facts supporting ground three of his original § 2255 motion: "Even if Mr. Boneshirt had escaped[,] he would have only received five years.  But he got alot [sic] more. See Judge Brights [sic] dissent."  Doc. 5-1 at 7.  This appears to reference Boneshirt's argument addressed and refused by the Eighth Circuit on direct appeal that it was improper for this Court to apply the obstruction-of-justice enhancement in the United States Sentencing Commission Guidelines Manual, section 3C1.1, after Boneshirt conspired with other inmates in an attempt to escape the Hughes County Jail.  See Boneshirt, 662 F.3d at 518; see also id. at 524 (Bright, J. dissenting).

certain punishments for certain juvenile offenders. Graham barred life-without-parole sentences for juveniles convicted of non-homicide offenses, 560 U.S. at 74, and Roper barred imposition of the death penalty on juvenile offenders, 543 U.S. 574–75. Both cases rely on the inherent characteristics of youth, such as a "lack of maturity and an underdeveloped sense of responsibility," susceptibility to "negative influences and outside pressures," and the "transitory" nature of a juvenile's character, to justify finding that juvenile offenders are less culpable and more capable of rehabilitation than adults that have committed similar offenses. See Graham, 560 U.S. at 71–74 ("In sum, penological theory is not adequate to justify life without parole for nonhomicide offenders."); Roper, 543 U.S. at 569–70. Thus, following Graham and Roper, a sentencing court may not impose the most severe punishment of all—the death penalty—on juvenile offenders, nor may a sentencing court impose the most severe penalty available for juvenile offenders—life without parole—on non-homicide offenders.

The second line of precedent underlying Miller arises out of capital punishment cases such as Woodson v. North Carolina, 428 U.S. 280 (1976). In Woodson, the Supreme Court found that a North Carolina law that made the death penalty mandatory for offenders convicted of first-degree murder violated the Eighth Amendment. Id. at 305 (plurality opinion). Part of the rationale behind the Supreme Court's holding was that the North Carolina law did not "allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." Id. at 302. Thus, before the most severe penalty may be imposed upon an offender, the sentencer must have the opportunity to consider the particular characteristics of the individual as well as the offense.

These two lines of precedent culminated in the Supreme Court's holding in Miller that a mandatory sentencing scheme imposing a sentence of life in prison without the possibility of

11

parole upon a juvenile offender—even one convicted of a homicide offense—violates the Eighth Amendment's prohibition of cruel and unusual punishment. Miller, 132 S. Ct. at 2469. The Supreme Court in Miller found that a sentence of life without parole for a juvenile was analogous to the death sentence for an adult because both sentences alter the remainder of the offender's life through an irrevocable forfeiture of rights. Id. at 2466. Further, the Supreme Court reasoned that a sentence of life without parole was more severe for a juvenile than for an adult because the juvenile offender would end up spending a longer period of time and a higher proportion of his life behind bars than would an adult offender. Id.

There are two issues with respect to the applicability of the Miller holding to Boneshirt's sentence: (1) whether Boneshirt was sentenced to life in prison without parole and (2) whether Boneshirt's sentence was mandatory. Boneshirt, however, was not sentenced to life in prison without parole. Moreover, even if Boneshirt's sentence could be considered a life sentence,[3] the statute under which Boneshirt was convicted did not mandate such a sentence. This Court had the opportunity to consider circumstances of youth in determining the sentence and did so. 10-CR-30008-RAL, Doc. 107 at 202–03. Thus, for the reasons explained below, the 576-month sentence given to Boneshirt does not violate the principles of Miller.

Boneshirt argues that, although nominally not a life sentence, his sentence of 576 months of imprisonment is the "functional equivalent" of a life sentence without parole. Doc. 20 at 13–18. In support of this argument, Boneshirt relies on several state court decisions applying Miller to sentences for a term of years and the United States Sentencing Commission's practice of equating a life sentence to a 470-month sentence for certain purposes. Doc. 20 at 18.

---

[3]The federal system has abolished parole, so a life sentence in the federal system does not include the possibility of parole. Therefore, a sentence of life without parole will usually be referred to as a "life sentence" in this opinion.

The first issue that must be addressed is whether a 576-month sentence imposed on Boneshirt is a life sentence. A life sentence is commonly understood to mean spending the rest of one's life in prison. See Black's Law Dictionary 1485 (9th ed. 2009); see also Long v. United States, No. CIV 13-1012-CBK, 2014 WL 1453312, at *3 (D.S.D. April 14, 2014) (distinguishing the "functional equivalent" of a life sentence from the "substantive equivalent" of a life sentence). In Miller there were two petitioners, both of whom received actual life sentences, so the Supreme Court did not expressly consider whether its reasoning could or would apply to very long sentences for a term of months. However, the Supreme Court has recognized that, at least for some purposes, a long sentence for a term of months and a life sentence are effectively the same. Graham, 560 U.S. at 70–71 (citing Harmelin v. Michigan, 501 U.S. 957, 996 (1991) ("In some cases . . . there will be negligible difference between life without parole and other sentences of imprisonment—for example, . . . a lengthy term sentence without eligibility for parole, given to a 65-year-old man.")); Sumner v. Shuman, 483 U.S. 66, 83–84 (1987) (noting that there was no basis for distinguishing between inmates serving life in prison and those serving a term sentence that "exceeds his normal life expectancy" within a statute that provided for a mandatory death penalty for inmates convicted of murder while serving a life sentence). In fact, the Supreme Court in Graham did not focus as much on the nominal classification of the sentence, whether a life sentence or a term of years, but found it unconstitutional to sentence a non-homicide offender to a "sentence [that] guarantees [the offender] will die in prison without any meaningful opportunity to obtain release." Graham, 560 U.S. at 79. Therefore, this Court agrees with Boneshirt's argument that term sentences virtually guaranteeing an offender will die in prison without meaningful opportunity for release could be considered a life sentence for the purpose of applying Graham or Miller.

13

Other courts have ruled similarly. In People v. Caballero, 282 P.3d 291 (Cal. 2012), the offender, Rodrigo Caballero, had been convicted of three counts of attempted murder and sentenced to 110 years to life in prison for shooting at rival gang members when he was sixteen years old. The Supreme Court of California found that Graham applied because the requirement that Caballero serve at least 110 years of his sentence before being eligible for parole offered him no "'realistic opportunity to obtain release' from prison during his . . . expected lifetime." Caballero, 282 P.3d at 295 (quoting Graham, 560 U.S. at 82). In State v. Ragland, 836 N.W.2d 107 (Iowa 2013), the Supreme Court of Iowa considered a sentence that allowed for the possibility of parole for a juvenile offender after serving sixty years. Citing standard mortality tables which established the offender's life expectancy at 78.6 years, the court in Ragland found that the sixty-year sentence making him ineligible for parole until the threshold of his life expectancy was the functional equivalent of a life sentence without parole, and violated the precepts established in Miller.[4] Ragland, 836 N.W.2d at 119, 121–22.

However, some courts have found that Graham and Miller do not apply to sentences to a term of years or months, even if the sentences exceed the offender's life expectancy. Bunch v. Smith, 685 F.3d 546, 551 (6th Cir. 2012) (finding that Graham did not create clearly established federal law barring consecutive, term sentences in excessive of an offender's life expectancy for non-homicide offenders) cert. denied sub nom. Bunch v. Bobby, 133 S. Ct. 1996 (2013); State v. Brown, 118 So. 3d 332, 341 (La. 2013) (finding Graham did not prohibit consecutive term sentences exceeding a juvenile offender's expected lifetime). Indeed, applying the holdings of Graham and Miller to term-of-months sentences could create difficulty in the close cases such as

---

[4]In a subsequent case, State v. Null, 836 N.W.2d 41 (Iowa 2013), the Iowa Supreme Court applied the reasoning of Miller and Graham to invalidate a mandatory minimum aggregate sentence that was not "clearly . . . beyond [the offender's] life expectancy" (52.5 years), but the holding was based on an independent interpretation of Iowa's state constitution. Id. at 70–72.

14

when life expectancy and age at the time of release are nearly equal. This difficulty makes the bright-line rule clearly distinguishing "life" sentences from sentences for terms of months attractive, but it ignores the direction of the Supreme Court in Graham that a juvenile offender convicted of a non-homicide crime must be afforded a "realistic opportunity to obtain release before the end" of his life. Graham, 560 U.S. at 82. Miller imposes further restrictions on the imposition of the same type of sentence as discussed in Graham, see Miller, 132 S. Ct. at 2458–59, so the same formulation of a "life sentence" is appropriate for application of Miller. Thus, to determine whether Boneshirt's sentence falls under the holding of Miller, this Court must determine whether the sentence imposed allows Boneshirt a "realistic opportunity to obtain release" before he dies.

It is easy to view a sentence of one hundred years as not affording a juvenile offender a realistic opportunity to obtain release, but Boneshirt's 576-month (forty-eight-year) sentence is much shorter than one hundred years and makes for a more difficult answer. When the Supreme Court recognized that a sentence for a term of years could be the equivalent of a life sentence, its illustrations referred to very long sentences for older adults. E.g., Harmelin, 501 U.S. at 996 (illustrating a "lengthy term sentence" imposed upon a sixty-five-year-old man). For purposes of applying the Eighth Amendment principles of Graham and Miller to juvenile offenders, courts have found that sentences ranging from sixty years to over one hundred years are equivalent to life sentences. See Moore v. Biter, 725 F.3d 1184, 1187 (9th Cir. 2013) (defendant not eligible for parole until age 144); Ragland, 836 N.W.2d at 119 (sixty-year sentence); Caballero, 282 P.3d at 293 (110-year sentence). But see Null, 836 N.W.2d at 70–72 (finding a 52.5-year sentence was a life sentence by applying Miller's rationale to the Iowa constitution). However, at least one court held that a fifty-year sentence is not the equivalent of a life sentence for application of

15

Miller. Ellmaker v. State, No. 108,728, 2014 WL 3843076, at *10 (Kan. Ct. App. Aug. 1, 2014) (per curiam) (finding juvenile's fifty-year sentence was not the "functional equivalent" of a life sentence). Neither the Supreme Court, nor any other court, has set a bright line at how long a sentence it takes to be the equivalent of a life sentence.

The United States Sentencing Commission for statistical purposes equates a life sentence to a 470-month sentence for the average offender:

> In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary to include these cases in any sentence length analysis. Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders.

2013 Sourcebook of Federal Sentencing Statistics app. A at 7, U.S. Sent. Comm'n, (18th ed. 2012) [hereinafter 2013 Sourcebook] available at http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2013/sourcebook-2013. Boneshirt argues that this shows that 470 months is the functional equivalent of a life sentence and therefore, any term sentence over 470 months should be treated as a life sentence for the application of Miller. Doc. 20 at 16–18. There are two flaws with Boneshirt's argument. First, the equivalency drawn by the Sentencing Commission is done for the purposes of statistical analysis in which numeric values must be placed on life sentences, not because a term of 470 months is in fact equal to a life sentence for any of the penological justifications outlined in Graham. Second, the Sentencing Commission's choice of a 470-month life expectancy is based on the average age of federal offenders. According to the 2013 data tables, the average age of a federal offender is thirty-six, 2013 Sourcebook tbl.6 (displaying the age of offenders by offense category), which would suggest a life expectancy of around seventy-five years for a thirty-six-year-old placed in

16

Bureau of Prisons' custody. Boneshirt was sentenced when he was eighteen, half the age of the average offender.

In reality, Boneshirt has a realistic opportunity to be released from custody before he dies. Boneshirt was eighteen years old at the time of sentencing and received credit against his sentence for the seven months in which he had been detained prior to sentencing. If Boneshirt serves his full sentence, then he will be released when he is sixty-five years old. Furthermore, although there is presently no parole system for federal inmates, Boneshirt could receive a reduction in his sentence for good behavior at a maximum rate of fifty-four days per twelve months served. 18 U.S.C. § 3624(b). Currently, Boneshirt is scheduled for release on September 6, 2051. Find an Inmate, Fed. Bureau Prisons, http://www.bop.gov/inmateloc/ (last visited Oct. 31, 2014) (click "Find by Name" and insert "Bryan Austin Boneshirt" into the appropriate name fields). At that time, Boneshirt will be fifty-nine years old. Boneshirt thus will be released from prison between the ages of fifty-nine and sixty-five.

It is impossible to determine precisely how long any one person has to live, but the question comes up regularly enough in several areas of law that government agencies have adopted standard actuarial tables for determining the life expectancy of a person. For determining the number of years left in a life annuity, the IRS expects an eighteen-year-old male to live nearly fifty-four more years to around age seventy-two. 26 C.F.R. § 1.72-9 at tbl.I. Another IRS table sets the life expectancy for an eighteen-year-old at another sixty-five years, living to be eighty-three. 26 C.F.R. § 1.401(a)(9)-9. The Social Security Administration has its own actuarial tables, which, in 2010 predicted that an eighteen-year-old male would live an average of another 58.9 years, to almost age seventy-seven. Actuarial Life Table, SSA, http://www.ssa.gov/oact/STATS/table4c6.html#ss (last visited Oct. 31, 2014). And as noted

17

previously, the Sentencing Commission has apparently found federal inmates, at least those incarcerated at age thirty-six, to have a life expectancy of seventy-five years. Thus, while there are various forecasts about how long Boneshirt might expect to live, he does have a realistic opportunity for release from custody before he dies. Accordingly, his sentence is not the equivalent of a life sentence.

Boneshirt argues that being a Native American male shortens his total life expectancy to fifty-eight years and cites a mortality study for support. Doc. 20 a 14 n.4, 18 (citing Christopher J.L. Murray et al., Eight Americas: Investigating Mortality Disparities Across Races, Counties, and Race-Counties in the United States, 3 PLoS Medicine 1513, 1514 (Sept. 2006) available at www.plosmedicine.org (mouse over the "Browse" button then click on "Journal Archive")). The study Boneshirt cites explores the health disparities among a "combination of race and county of residence" by dividing the United States into subgroups dubbed the "eight Americas" based on "sociodemographic and geographical variables."[5] Murray et al., supra at 1514. Part of the research explored the life expectancy of the different subgroups over a period of time, but Boneshirt does not cite the results of the study. Instead Boneshirt cites an illustration in the introduction explaining why the researchers used the statistics they did: "When race-county combinations are considered, life expectancy disparities are dramatically larger. For example, Native American males in the cluster of Bennet [sic], Jackson, Mellette, Shannon, Todd, and

---

[5]For example, "America 5" includes one million people drawn from "Native American populations in the mountain and plains areas, predominantly on reservations," while "America 2" includes 3.6 million people made up of "[w]hites in [the] northern plains and Dakotas with 1990 county-level per capita income below $11,775 and population density less than 100 persons/km$^2$." Murray et al., supra at 1516 Table 1.

Washabaugh[6] Counties in South Dakota had a life expectancy of 58 [years] in 1997–2001, compared to Asian females in Bergen County, New Jersey, with a life expectancy of 91 [years], a gap of 33 [years] . . . ." Id. at 1514.  One cannot confidently apply that statistic to Boneshirt because, although he has spent a period of his life in Todd County, he will not be living in that cluster of counties while serving his sentence.  Moreover, the two possible explanations for shorter life expectancies in America 5 (comprised of Western Native Americans) proffered by the authors of Eight Americas are alcohol-related deaths and poor access to healthcare on and near reservations.[7]  Id. at 1519–20.  These conditions are presumably mitigated by federal custody.

In sum, Boneshirt's sentence does not guarantee that he will spend the rest of his life behind bars.  Boneshirt probably will live out his term of incarceration and then be released. Because he was not sentenced to life in prison as it is characterized in Graham, the sentencing protections required by Miller do not apply to Boneshirt's sentencing.  Therefore, Miller does not provide a ground to justify relief to Boneshirt under § 2255.

Even if Boneshirt's sentence could be considered the equivalent of a life sentence, the sentencing procedure required by federal law and used by this Court satisfied the requirements of Miller.  Miller expressly left open the question of whether a life sentence without parole was categorically barred for all juvenile offenders.  Miller, 132 S. Ct. at 2469 ("Because that holding [requiring individual sentencing determinations] is sufficient to decide these cases, we do not

---

[6]Washabaugh County, South Dakota ceased to exist in 1983.  Washabaugh County, South Dakota, Wikipedia, http://en.wikipedia.org/wiki/Washabaugh_County,_South_Dakota (last visited Nov. 5, 2014).
[7]These are valid explanations for the reduced life expectancy of Native American males on South Dakota Indian Reservations, as would be increased rates of homicides, drunk driving deaths, suicides, diabetes, alcoholism, and poor nutrition and diet.  There is no doubt that crisis conditions exist on Native American Indian Reservations in South Dakota.

consider [the petitioners'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger."). Miller did not preclude the possibility that some juvenile homicide offenders rightfully may deserve a sentence of life in prison without parole, it only required that a "judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." Id. at 2475.

The sentencing guidelines for Boneshirt recommended a sentence from 360 months to life in prison. However, the guideline range is not mandatory, but just one factor a sentencing court must consider. 18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220, 265 (2005) (making the Sentencing Commission guideline range advisory). A sentencing court also must consider the other § 3553 factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §§ 3553(a)(1)–(2). If a court determines that the guideline range results in a punishment that is "'greater than necessary' to achieve § 3553(a)'s sentencing objectives in a particular case," then it may impose a sentence below the guideline range. United States v. Hill, 552 F.3d 686, 692 (8th Cir. 2009) (quoting Kimbrough v. United States, 552 U.S. 85, 111 (2007)). Thus, this Court not only had the ability to impose a sentence below the guideline range if it had seen fit to do so, but also had a statutory obligation to consider Boneshirt's individual characteristics, including his age at the time of the offense.

This Court followed the § 3553 sentencing requirements and considered Boneshirt's youth and all the attributes that come along with it. This Court considered an extensive presentence investigation report prior to sentencing. At the sentencing hearing, this Court heard statements from three people who spoke on Boneshirt's behalf. 10-CR-30008-RAL, Doc. 107 at 161–69. A juvenile probation officer that had formerly had Boneshirt under her supervision and Boneshirt's mother both spoke about the difficult upbringing Boneshirt endured. 10-CR-30008-RAL, Doc. 107 at 161–63, 167–69. This Court expressly stated that it considered Boneshirt's age and upbringing as well as his possible neurological deficiencies when formulating the sentence imposed. 10-CR-30008-RAL, Doc. 107 at 202–03. Ultimately, however, while taking Boneshirt's youth into consideration, other sentencing factors prescribed by § 3553, including the need to ensure the protection of the public, justified the sentence imposed. 10-CR-30008-RAL, Doc. 107 at 203.

In light of the conclusion arrived at in this opinion, there is no need to determine whether the decision in Miller applies retroactively.

**E.      Certificate of Appealability**

"The final order in a proceeding under section 2255" may not be appealed unless a "certificate of appealability" is issued by a district court or a circuit justice. 28 U.S.C. § 2253(c)(1). "A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 11. This Court may issue a certificate of appealability only if a petitioner has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Such a substantial showing requires that the petitioner show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

21

Slack v. McDaniel, 529 U.S. 473, 484 (2000). Although courts have disagreed about whether Miller should be applied to a term-of-years sentence, all reasonable jurists would agree that a term sentence for which the defendant will be, at oldest, sixty-five at the time of his release is not a life sentence that falls within Miller. Long, 2014 WL 1453312 at *4. Further, no reasonable jurist could find that Boneshirt's sentence was mandated by a law that did not give the court the opportunity to consider the mitigating circumstances of youth prior to sentencing.

**III.   CONCLUSION**

The Eighth Amendment rights of petitioner have not been violated and any relief must be denied. Therefore, for the reasons stated above, it is hereby

ORDERED that Boneshirt's Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 is denied.

**TO THE UNITED STTES COURT OF APPEALS FOR THE EIGHTH CIRCUIT:**

Petitioner pleaded guilty to Second Degree Murder in violation of 18 U.S.C. §§ 1153 and 1111. Petitioner has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 contending that his sentence was unconstitutional under the Eighth Amendment's Cruel and Unusual Punishment Clause. After reviewing the record and filings by both parties, this Court has denied petitioner's motion to vacate. Pursuant to 28 U.S.C. § 2253, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Petitioner has not made a substantial showing of the denial of a constitutional right.

IT IS HEREBY CERTIFIED that there does not exist probable cause of an appealable issue with respect to this Court's order denying petitioner's § 2255 motion. Any application for

a certificate of appealability is denied.  This in no way hampers the petitioner's ability to request

issuance of the certificate by a circuit judge pursuant to Fed. R. App. P. 22.


Dated November 19th, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE